Argued and submitted April 22, 2019, affirmed July 15, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

PAMELA JEAN HOPKINS,
aka Pamela Jean Robinson,
*Defendant-Appellant.*

Marion County Circuit Court
16CR10685; A165452

469 P3d 238

Defendant was charged with, and found guilty of, among other offenses, two counts of first-degree burglary, ORS 164.225, and one count of attempted aggravated murder, ORS 161.405, ORS 163.095 (2017), *amended by* Or Laws 2019, ch 635, §§ 1-4, and she appeals the resulting judgment of conviction. Those counts required the state to prove that defendant unlawfully remained in the victim's apartment before defendant stole oxycodone from the victim and assaulted her. On appeal, defendant assigns error to the trial court's denial of her motion for a judgment of acquittal with respect to those counts on the basis that the state failed to prove that defendant unlawfully remained in the victim's apartment. *Held*: The trial court did not err. The evidence was legally sufficient for a rational trier of fact to have found, beyond a reasonable doubt, that the victim impliedly revoked her permission for defendant to be present in the victim's apartment, and thereafter defendant unlawfully remained in the victim's apartment with the intent to commit the additional crimes.

Affirmed.

Donald D. Abar, Judge.

David O. Ferry, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

Jamie Contreras, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

TOOKEY, J.

Affirmed.

**TOOKEY, J.**

Defendant was charged with, and found guilty of, among other offenses, two counts of first-degree burglary, ORS 164.225, and one count of attempted aggravated murder, ORS 161.405, ORS 163.095 (2017),[1] and she appeals the resulting judgment of conviction. Those counts required the state to prove that defendant unlawfully remained in the victim's home before defendant stole oxycodone from the victim and assaulted her, and, on appeal, defendant assigns error to the trial court's denial of her motion for a judgment of acquittal (MJOA) with respect to those counts on the basis that the state failed to prove the trespass element of burglary. For the reasons that follow, we conclude that the trial court did not err and therefore affirm.

"We review the denial of a motion for a judgment of acquittal by examining the evidence in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential elements of the crime beyond a reasonable doubt." *State v. Fuller*, 303 Or App 47, 48, 463 P3d 605 (2020) (internal quotation marks and brackets omitted). In other words, "We will reverse a trial court's denial of a motion for judgment of acquittal only where no rational trier of fact could find all of the elements of the crime beyond a reasonable doubt." *State v. Shewell*, 178 Or App 115, 118, 35 P3d 1096 (2001), *rev den*, 334 Or 491 (2002). We state the following facts in accordance with that standard.

The victim was a 57-year-old woman who lived in a one-bedroom apartment with her two cats. She suffered from chronic health issues and had very limited mobility—she was paralyzed from the knee down on her right side—and used a walker or a cane to get around. She had a prescription for oxycodone and, on occasion, sold it.

Defendant and the victim were neighbors and had known each other for three years. They socialized nearly

---

[1] ORS 163.095 was substantially amended in 2019. Or Law 2019, ch 635, §§ 1-4. "Personally and intentionally" committing homicide in the course of and furtherance of first-degree burglary, by itself, no longer constitutes the offense of aggravated murder. *Id.*

every day, and the victim considered defendant to be her friend. Defendant also took the victim to appointments and to shop. Defendant used oxycodone for medical reasons but she was addicted to it and also misused it. The victim began to suspect that defendant was stealing oxycodone from her and told defendant that she was hiding her oxycodone in her bra so that "people" would not steal it anymore.

On the morning of the victim's birthday, defendant knocked on the victim's door, and the victim let defendant into her apartment. Their plan for the day, so far as the victim was aware, was to go to the store to purchase a "birthday blouse" for the victim, followed by spending time in the victim's apartment and eating dinner. After some "chit chat" and drinking a cup of coffee, the victim gave defendant two dollars to buy cigarettes at a nearby 7-11. Defendant walked toward the front door, and the victim walked down the hallway to her bedroom to say goodbye to her cats.

After the victim told her cats that she would be right back, defendant, standing behind the victim, put a rope around the victim's neck and pulled it. The victim struggled, putting her fingers between the rope and her neck to stop the choking pressure. As defendant choked the victim with the rope, defendant said to the victim, "Why don't you *** die? Why?"

As they struggled, the victim fell between her bed and a heater that ran along the baseboard in her bedroom. Once the victim fell to the ground, defendant put her knee or her foot on the victim's back and pulled the rope, which was still around the victim's neck, up. As defendant was assaulting the victim, the victim told defendant to stop and let go, but defendant kept tightening the rope.

Defendant then got up, grabbed two statues made of "cement plaster type material" from a shelf on the victim's headboard, and brought each statue down on the victim's head "two or three times" until the statues broke, which caused significant bleeding. The victim, at that point, was getting exhausted.

Defendant then grabbed a pillow and tried to suffocate the victim with it, while using one of her hands

to squeeze the victim's nose, so that the victim could not breathe. Defendant next put her hand into the pillow case and started shoving her fingers down the victim's throat. The victim responded by trying to bite defendant, although that proved unsuccessful. While this occurred, defendant said to the victim, "Just die. I don't want to hurt you." At some point while defendant was trying to suffocate the victim with the pillow, defendant ripped the victim's bra off and took the victim's bottle of oxycodone.

Defendant left the room and got a hammer from the victim's kitchen. Defendant hit the victim in the head with the hammer and, once the victim began to shield her head from the hammer using her arms, defendant hit the victim in the arms with the hammer. While defendant hit the victim with the hammer, defendant kept "telling [the victim] to die." Eventually, defendant stopped hitting the victim with the hammer, but there was further struggle in the bathroom, where defendant tried to drown the victim in the bathtub.

During at least some of the assaults, the victim struggled, and tried to get defendant away from her. Defendant was left with scratch marks on her face that were consistent with wounds caused by someone trying to defend themselves against her. Additionally, during at least some of defendant's assaults against the victim, the victim "kept trying to talk to [defendant] to get her to come back to her old self."

After defendant's assaults against the victim had stopped, the victim told defendant, "It's okay. You can go," and defendant told the victim that defendant would have to tie the victim up and "close [her] mouth" first, to which the victim replied, "You'll kill me if I let you do that."

Defendant was charged with, among other crimes, one count of attempted aggravated murder (Count 1), and two-counts of first-degree burglary (Counts 5 and 6). Count 1 alleged that defendant, unlawfully and intentionally, committed the "crime of Burglary in the First Degree and in the course of and in furtherance of the crime that defendant was committing, defendant personally and intentionally attempted to cause the death of [the victim]." Count 5 alleged

that defendant unlawfully and knowingly "remain[ed] in a dwelling * * *, with the intent to commit the crime of theft therein." Count 6 alleged that defendant unlawfully and knowingly "remain[ed] in a dwelling * * *, with the intent to commit the crime of assault therein."

Defendant waived her right to a jury trial, and her case was tried to the court. At the close of the state's case-in-chief, defendant moved for a judgment of acquittal on Counts 1, 5, and 6. The trial court denied the MJOA after considering the import of two Court of Appeals decisions, *State v. Felt*, 108 Or App 730, 816 P2d 1213 (1991), *rev den*, 313 Or 75 (1992), and *State v. Werner*, 281 Or App 154, 383 P3d 875 (2016), *rev den*, 361 Or 312 (2017), in which we considered revocation of permission to stay on the premises for the purpose of deciding whether a burglary had been committed. The trial court found defendant guilty of one count of attempted aggravated murder for personally and intentionally attempting to cause the death of the victim in the course of and in furtherance of the crime of first-degree burglary, and two counts of first-degree burglary,[2] specifically determining that there "was more than sufficient evidence" of an "implied" revocation of "any prior consent that was given to the Defendant to enter the residence" when "the victim started to fight back."

Under ORS 164.215(1), "a person commits the crime of burglary in the second degree if the person enters or remains unlawfully in a building with intent to commit a crime therein." If the building at issue is a dwelling, the crime is elevated to first-degree burglary. ORS 164.225. "By definition, criminal trespass is an essential element of burglary." *State v. Angelo*, 282 Or App 403, 407, 385 P3d 1092 (2016), *rev den*, 361 Or 311 (2017). Criminal trespass is defined, in relevant part, by ORS 164.245(1), as a "person

---

[2] The trial court also found defendant guilty of second-degree assault and felony strangulation, for her use of the rope to choke the victim; first-degree assault, for her use of a statue to bludgeon the victim; second-degree assault, for her use of the hammer to bludgeon the victim; and misdemeanor strangulation, for blocking the victim's nose. During defendant's sentencing, the trial court merged the two first-degree burglary guilty verdicts into the attempted aggravated murder conviction, but did not merge the assault guilty verdicts, determining that there was a "sufficient pause in the criminal conduct to afford the Defendant time to reflect or renounce what she was doing."

enter[ing] or remain[ing] unlawfully * * * in or upon prem-
ises." Thus, at "its essence, burglary comprises three ele-
ments: (1) unlawfully entering or remaining in or upon; (2) a
building; and (3) with the intent to commit a crime therein."
*Angelo*, 282 Or App at 408; *see also State v. Henderson*, 366
Or 1, 13, 455 P3d 503 (2019) ("The additional element that
raises trespass to burglary—the intent to commit an addi-
tional crime 'therein'—must exist at some point during the
unlawful presence."). ORS 164.205(3)(a) provides that to
"enter or remain unlawfully" means "[t]o enter or remain in
or upon the premises when the premises, at the time of such
entry or remaining, are not open to the public and when the
entrant is not otherwise licensed or privileged to do so."

In *Felt*, the defendant was convicted of burglary
after he (1) entered his former girlfriend's apartment with
her permission in order to use her telephone, (2) then, after
she refused his request for a kiss and he kissed her anyway,
she pushed him away, and (3) he subsequently assaulted
her. 108 Or App at 732. On appeal, the defendant argued
that the trial court erred in denying his MJOA because "the
state offered no evidence that the victim had revoked her
permission for him to be on the premises." *Id.* at 733. The
defendant argued that was so because he was "never told or
asked to leave." *Id.*

We considered "whether the state proved that defen-
dant 'unlawfully remained' in the victim's home after he
had received permission to enter." *Id.* at 732. We affirmed
the trial court's denial of the defendant's MJOA, reasoning,
in part, that the evidence in the case "would support the
inference that, when [the victim] reacted against defendant,
she impliedly revoked her permission that he remain on the
premises." *Id.* at 733. In other words, we affirmed because
there was legally sufficient evidence to support a finding
that the victim "withdrew her consent" and that, after that
point, the defendant was "no longer privileged to remain in
the residence." *Id.* at 734.

We addressed a different question in *Werner—viz.*,
"whether engaging in unauthorized conduct in a building
constitutes unlawfully remaining in the building for the
purposes of the burglary statute." 281 Or App at 161. In that

case, the defendant was hired by the complainant to work at the complainant's house, and, during the course of that work, the complainant and his wife left for approximately one week. *Id.* at 156. During the complainant's absence, the complainant had given the defendant permission to do "whatever he needed to do" to complete the work at the house. *Id.* The complainant gave the defendant a house key and turned off the house alarm. *Id.* Upon the complainant's return, he discovered that property was missing from the house. *Id.* at 157. The defendant later admitted taking the property. *Id.* The defendant was convicted of burglary. *Id.* at 160. During the defendant's trial, he moved for a judgment of acquittal on the burglary charge, arguing that, because he had permission to be in the house, he had not entered or remained unlawfully, as required to convict him of burglary. *Id.* at 156. The trial court denied the defendant's MJOA. *Id.*

The state's theory in *Werner* was that the "defendant was guilty of burglary because he engaged in unauthorized conduct—the taking of property—in [the complainant's] house; in other words, the state's theory was that defendant was guilty of burglary because he committed theft inside the house." *Id.* at 158-59. After considering the text, context, and legislative history of the burglary and criminal trespass statutes, we rejected that theory, explaining that "burglary is a separate crime from, and necessarily precedes, the commission of the intended crime." *Id.* at 163. The state's theory, however, failed "to treat burglary as a separate, earlier crime than the crime intended to be committed in the building." *Id.* We reasoned:

"In cases like [*Werner*], the state's argument essentially makes burglary and commission of the intended crime one and the same, even though the legislature intended burglary to be separate from (and not dependent upon) the subsequent commission of the intended crime. In addition, it eliminates the requirement that the criminal trespass coincide with the intent to commit a crime. The state reasons that, if a person commits a crime in a building, the person becomes a trespasser and, apparently retroactively, a burglar. If, as the state argues, the commission of a crime is what causes a person who is otherwise licensed to be present in a building to become a trespasser, then the

person is not trespassing with the intent to commit that crime."

*Id*.

Thus, we concluded that "the commission of a crime does not, in and of itself, convert a lawful entry into an unlawful remaining," and that "because the only evidence that the state presented regarding the criminal trespass element of the charged burglary *** was that defendant committed theft, the trial court erred by denying defendant's motion for judgment of acquittal on the burglary count." *Id*. at 168. Additionally, we noted that *Werner* was distinguishable from *Felt*. In *Werner*, the "state did not present any evidence that [the complainant] revoked his consent before defendant committed the theft," whereas, in *Felt*, "the state had presented evidence that the defendant remained in his former girlfriend's apartment after she implicitly revoked her permission to be there by physically pushing him away." *Werner*, 281 Or App at 167.

On appeal, defendant relies on *Werner* to argue that, because "defendant's commission of a crime in the victim's home did not convert her lawful presence into an unlawful one, the state failed to prove that defendant unlawfully remained in the victim's home during the crime." *Werner* requires that a burglary is viewed "as a separate, earlier crime than the crime intended to be committed in the building" because the "legislature intended burglary to be separate from (and not dependent upon) the subsequent commission of the intended crime," 281 Or App at 164, and, in defendant's view, her case was like the circumstances in *Werner*, where there was no evidence that the homeowner had revoked his consent to remain in the home before the defendant stole the property. Thus, defendant argues that the trial court erred because the state presented "no evidence that the victim had explicitly or impliedly revoked defendant's permission to be in her home *before* defendant committed assault and attempted murder." (Emphasis in defendant's brief.) Defendant also argues that the facts of this case are distinguishable from *Felt*.

The state, for its part, argues that it "introduced sufficient evidence that the victim impliedly revoked defendant's

license to remain in her residence after defendant's initial attempts to kill her." In the state's view, *Werner* does not hold that a guest's permission to remain on another's premises cannot be impliedly revoked at some point during an ongoing attack.

We disagree with defendant that *Werner* controls. As noted above, in *Werner*, "the only evidence that the state presented regarding the criminal trespass element of the charged burglary *** was that defendant committed theft." 281 Or App at 168. By contrast, in this case, the victim struggled, putting her fingers between the rope and her neck soon after defendant began to assault her. At that point, she impliedly revoked her permission for defendant to be present in the victim's apartment before the subsequent attacks and before defendant stole the victim's oxycodone. *See Felt*, 108 Or App at 733 ("[T]he circumstances of this case would support the inference that, when [the victim] reacted against defendant, she impliedly revoked her permission that he remain on the premises."). Once the victim resisted the attack, she impliedly revoked her permission for defendant to remain in her home and, from that point on, defendant was trespassing with the intent to commit additional assaults against the victim and steal the oxycodone.

Defendant contends that this case is distinguishable from *Felt* because, in this case, the victim did not fight back until *after* defendant commenced her assaultive conduct and that the subsequent assaults were part of a "single criminal episode" aimed to murder the victim. It is true that the evidence in this case reflects that the victim was attacked by surprise from behind with a rope and she did not "fight back" until after defendant had placed the rope around her neck. However, *Felt* does not stand for the proposition that a person cannot revoke their permission for another person to remain on their premises *while* they are being subjected to repeated assaults. Although the implied revocation in *Felt* occurred when the victim pushed the defendant before he assaulted her, *Felt* does not hold that an implied revocation of a permission to remain on premises cannot occur after an assault begins. *See Felt*, 108 Or App at 733 ("[A] reasonable jury could have found that, *from the point* at which [the victim] refused defendant's request for further intimacy,

defendant was no longer acting within the limits of the consent given." (Emphasis added.)).

As to defendant's contention that the attacks against the victim were part of a "single criminal episode" of attempted murder—for which the victim must have revoked permission before the episode began—we note that, to the extent that defendant is arguing that the principles that guide us when deciding whether a defendant's conduct constitutes a single "criminal episode" for purposes of merger, *see* ORS 161.067, apply in this circumstance, defendant does not endeavor to explain why those principles should be imported to the context of deciding whether a victim has revoked permission for another person to remain on the victim's premises. The argument is therefore insufficiently developed for us to address it. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to on recons*, 187 Or App 472, 68 P3d 259 (2003) (it is not "our proper function to make or develop a party's argument when that party has not endeavored to do so itself").

Defendant also argues that this case is distinguishable from *Felt* because the victim did not purport to revoke her permission for defendant to be in her apartment at any point *during* the episode. That is, not only did the victim not push defendant away like the victim in *Felt* did, but the victim kept trying to talk defendant into coming "back to her old self" and, after the attacks, gave defendant permission to leave. But, as noted above, the victim in this case suffered from chronic health issues and had very limited mobility. It was sufficient in this case for the victim to struggle and put her fingers between the rope and her neck to manifest a revocation of her permission for defendant to remain. As to the victim's attempts to persuade defendant not to kill her and to leave, neither means that the victim did not revoke her permission for defendant to remain in the victim's home nor negate that revocation.[3]

---

[3] Defendant also argues this case is distinguishable from *Felt* for an additional reason. In defendant's view, in *Felt*, "the victim's attempt to push the defendant away supported an inference that [the victim] had revoked his permission to be [in the victim's apartment] *because* the defendant was acting outside the scope of the permission he was given to enter (the victim specifically permitted

In sum, we conclude the evidence was legally sufficient for a rational trier of fact to have found, beyond a reasonable doubt, that defendant in this case unlawfully remained in the victim's apartment, and "at some point during the unlawful presence," had "the intent to commit" the additional crimes of theft and assault. *Henderson*, 366 Or at 13. Consequently, we affirm.

Affirmed.

---

him to enter to use the phone), and expressly contrary to her denial of his request to expand that permission (she *denied* him permission to kiss her when he stayed and asked to do so)." (Emphases in defendant's brief.) Defendant contends that, "although not explicitly discussed in *Felt*, the court's holding necessarily relies on the reasonability of the obvious inference that defendant *would have known* that he had exceeded his permission based on the victim's conduct *prior to*" the subsequent crime. (Emphases in defendant's brief.)

To the extent the court in *Felt* "necessarily relie[d]" on the inference that the defendant would have known that he exceeded his permission to be in the victim's apartment after she pushed him away, as defendant in this case contends, we find that inference to be equally applicable here, where defendant was present in the victim's apartment for a social visit, but, subsequently, assaulted and attempted to murder the victim through varied conduct in order to steal the victim's oxycodone while the victim struggled to live. It is a reasonable inference that defendant "would have known" that she did not have permission to remain in the victim's apartment, but, nevertheless, stayed with the intent to commit additional criminal acts—*viz.*, theft and assault.